**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

VERONICA PIERCE
AND FLINT PIERCE,

     **Plaintiffs,**

     **v.**                **Cause No. 1:15-CV-00758-LF-KBM**

GOVERNING COUNCIL FOR
ALICE KING COMMUNITY
SCHOOL, et al.,

     **Defendants.**

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS BASED ON
QUALIFIED <u>IMMUNITY BY DEFENDANTS CHENE, HENDERSON, AND
ROMERO</u>**

Plaintiffs Veronica Pierce (Mrs. Pierce) and Flint Pierce (Dr. Pierce) (collectively

Plaintiffs or the Pierces) by and through their counsel of record, Freedman Boyd

Hollander Goldberg Urias & Ward, PA (Vincent Ward and Frank Davis) and the Law

Offices of Lucero & Howard, LLC (Leon Howard) hereby respond to Defendants Connie

Chene, Tamara Henderson, and Carlos Romero's (collectively referred to as the

Individual School Defendants or Defendants) Motion to Dismiss based on Qualified

Immunity [Doc. 44] as follows.

**I.**      **INTRODUCTION**

This case arises from a dispute between the Pierces and the Individual School

Defendants over the Alice King Community School's (AKCS) failure to respond to

complaints of bullying by their young daughter. When the Pierces voiced concern about

the school's lack of attention to the bullying allegations, Defendants began a coordinated

campaign of retaliation to stop the Pierces from criticizing them. The retaliatory acts

consisted of banning the Pierces from the school's campus, refusing to communicate with the Pierces about their children's education, lodging false criminal allegations, supporting a teacher's efforts to obtain a restraining order, and eventually dismissing the Pierces' children from the school. The retaliatory conduct followed in lock step with the Pierces attempts to air their grievances to the ACKS board, as well as APS and State officials, all of which constituted constitutionally protected speech.

**A.      Summary of argument.**

In their Motion to Dismiss, the Individual School Defendants argue they are entitled to qualified immunity for three reasons. First, they claim the underlying retaliatory acts alleged in the complaint were not themselves unconstitutional. That is, because the Pierces did not have a constitutional right to access school grounds, their children did not have a constitutional right to attend the school, the criminal trespassing allegations were supported by probable cause, and Ms. Shay VanDerMey's restraining order was not connected to official school business, the Pierces' claims are without merit.

Second, the Individual School Defendants argue the Pierces were afforded adequate due process to challenge the banning order. And third, Defendants assert the Pierces' malicious prosecution claim is improper because they were never arrested or subjected to the control of the State.[1] As explained below, these arguments misconstrue the claims as alleged in the Pierce's Amended Complaint [Doc. 10] and misapply the law

---

[1] Plaintiffs intend to voluntarily dismiss the malicious prosecution claim against Defendants Chene and Henderson as set forth in Count VI of the Amended Complaint [Doc. 10]. The allegations in Count VI are also asserted in Count III. Because the allegations are contained in Count III, dismissing Count VI will not alter the landscape of the litigation.

of qualified immunity and the applicable standard of review for motions brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This case is ***not*** about whether Plaintiffs had a well-established constitutional right to send their children to a charter school or whether the constitution granted them unfettered access to the school's campus. Rather, this case is about ***the well-established right of every individual in this country to engage in protected speech without retaliation by officials acting under color of state law***. The complaint tells a very simple story, all of which this Court must take as true.

The Pierces complained to ACKS officials, APS and the State about the school's failure to address the frequent and persistent bullying of their daughter. Rather than working with the Pierces to resolve the issue, the Pierces were barred from the AKCS campus, prevented from communicating with their children's teachers or the school's administrators in any meaningful way, forced to defend themselves in a baseless criminal case and civil retraining order proceeding, and eventually, their children were expelled from school. These acts were substantially motivated by the Pierces' criticisms of the Individual School Defendants. ***This*** is the basis of the lawsuit.

Finally, the Pierces' right to due process was violated when the Individual School Defendants deprived them of the opportunity to direct their children's education by barring them from the school's campus and prohibiting them from communicating with their children's teacher without providing them with notice and a meaningful hearing. There is perhaps no greater constitutional interest than to direct the care, custody and education of a child. As a result of the banning decision, the Pierces were unable to

ensure that their children were safe at school or that their educational experience was adequate.

**B.    Relevant Facts**

The Pierce's enrolled both their children at AKCS during the 2013-14 school year. That year the Pierce's daughter's teacher was Ms. VanDerMey.[2] Amended Complaint, ¶ 4. Beginning in February 2014, the Pierce's daughter complained of bullying. *Id.*, ¶ 5. When asked about the bullying, Ms. VanDerMey explained to the Pierces that she had not seen any of the harassment, but that the other student could come across as "harsh at times." *Id.*, ¶ 6. The next day Ms. VanDerMey informed the Pierces that the offending student had written their daughter a "heartfelt note of apology." *Id.*, ¶ 7. For the remainder of the month the Pierces' daughter continued to complain of bullying, *id.*, ¶ 8. By February 26, 2014, Ms. VanDerMey was of the opinion that both students were at fault even though she had never informed the Pierces of any disciplinary problems involving their daughter. *Id.*, ¶ 9.

It was not until a March 3, 2014 meeting with Defendant Chene, the principle of AKCS at the time, that the Pierces learned that their daughter had been sent to the principles office the week before along with the other student. *Id.*, ¶¶ 10-11. Defendant Chene admitted that she "had a more stern conversation" with the other student and that he was "in trouble a lot." *Id.*, ¶ 11. Between March 12 and April 1, 2014, the bullying persisted. *Id.*, ¶ 13. The Pierces reported the bullying to Ms. VanDerMey. *Id.* On or about

---

[2] This Court dismissed the claims against Ms. VanDerMey on April 27, 2016. *See* Order Granting Motion for Judgment on the Pleadings with respect to Defendant VanDerMey. [Doc. 380].

April 1 the other student whispered a threat to the Pierces' daughter. *Id.* When Mrs. Pierce alerted Ms. VanDerMey to the threat, she never responded. *Id.*

Around the same time neither Ms. VanDerMey nor Defendant Chene were available to meet with the Pierces regarding their concerns. *Id.*, ¶¶ 15-17. Defendant Chene offered in an email to move the Pierces' daughter out of Ms. VanDerMey's classroom but the Pierces did not believe this was a good idea because it would effectively punish their daughter for being a bullying victim. *Id.*, ¶ 17. That same day Mrs. Pierce approached the other student's father about the situation. *Id.*, ¶ 19. When Defendant Chene saw the parents talking she intervened and stated that she was considering the Pierces' daughter out of Ms. VanDerMey's classroom. *Id.*, ¶ 21.

Frustrated by this, on April 10 Mrs. Pierce asked how she could voice her concerns to the school's governing council; she reported the problems to APS; and then on April 11 she contacted Mr. Mark Tolley, the charter schools director for APS. *Id.*, ¶¶ 22-23. ***On April 15, just four days later, Defendant Chene directed the Pierces to cease all communication with Ms. VanDerMey.*** *Id.*, ¶ 26.

After several attempts to reach the governing council, on April 22 Defendant Romero, the president of the council, wrote Mrs. Pierce and suggested that she schedule a meeting with Ms. Chene. *Id.*, ¶ 28. That same day the Pierces' daughter reported another bullying incident. *Id.*, ¶ 29. When Mrs. Pierce approached Ms. Chene that same day to discuss the situation, ***Defendant Chene stated, "I have nothing else to speak with you about, ma'am."*** *Id.*, ¶ 30.  The Pierces were finally able to meet with Defendants Chene and Henderson (who at the time served as the vice principle). *Id.*, ¶ 32.

At the meeting Defendant Chene laughed at Mrs. Pierce when she pointed out that school never conducted a formal investigation of the bullying allgations. *Id*, ¶ 33. When Mrs. Pierce asked Defendant Chene why she was laughing, she said it was "because none of the allegations were true." *Id.* **Defendant Chene then threatened the Pierces by stating that their children could be removed from the school for "disrupting the educational environment."** *Id.*

On April 22 Ms. Pierce sent Defendant Romero an email about the meeting with Defendant Chene, including the laughing and threat, and informed him of a new bullying incident. *Id.*, ¶ 35. **The next day an officer with the Albuquerque Police Department contacted the Pierces concerning Defendants Chene and Henderson's alleged fear of potential violence.** *Id.*, ¶ 36. **The officer admitted during the meeting with the Pierces that AKCS was considering expelling their children.** *Id.*, ¶ 37.

Two days later, while Mrs. Pierce was merely escorting her children to class, Defendant Chene physically accosted her in front of other parents and **proclaimed that she was not allowed to escort her children to class.** *Id.*, ¶ 40. **On April 24, just two days later, Defendant Chene sent the Pierces a letter informing them that that the school's investigation did not substantiate the bullying allegations, their children could be expelled from school, and they were banned from campus immediately even for purposes of escorting their children to class.** *Id.*, ¶ 41.

On April 28, Defendant Henderson told Mrs. Pierce while she was dropping off her children that she was not allowed to be on campus; she also sent an email to the governing council informing it that Mrs. Pierce had refused to comply with the banning letter. *Id.*, ¶ 42. Following this incident, Dr. Pierce attempted to communicate with his

children's teachers by email, including about standardized testing, but none of the emails ever received a response. *Id.*, ¶ 43.

On April 30, Dr. Pierce had sought and received permission to speak to the AKCS governing council about the Pierces problems with respect to their daughter's bullying and the lack of attention from the administration. *Id.*, ¶ 45. Defendant Romero placed restrictions on Dr. Pierce's comments, including limiting his comments to three minutes and prohibiting him from referring to any AKCS staff by name. *Id.* Before Dr. Pierce spoke, Defendant Romero once again offered mediation. *Id.*, ¶ 46. In the spirit of cooperation Dr. Pierce refrained from making any remarks at the meeting. *Id.*

Despite their best efforts the Pierces were unable to schedule a mediation with the school as Defendant Romero had promised. *Id.*. ¶ 48. **On May 5, Defendant Henderson informed Mrs. Pierce that she could not even wait curbside for her daughter**. *Id.*, ¶ 49. **That same day the Pierces received a letter from the school's attorney dated April 30 informing them that they were not allowed on the AKCS campus. *Id.*, ¶ 50.** Also that same day the Pierces consulted with an Albuquerque Police officer who informed them they were allowed to be on campus. *Id.,* ¶ 51. The next day, May 6, he escorted them on to campus. *Id.*, ¶ 52. ***The officer revealed to the Pierces that Defendant Chene wished to expel their children from the school. Id.*, ¶ 53.**

Nearly three weeks after agreeing to mediation, on May 19 Defendant Romero informed the Pierces that the governing council would hold a special meeting on May 21 in order to discuss their concerns. *Id.*, ¶¶ 54-55. The Pierces lacked reasonable notice and a meaningful hearing, but did the best they could to explain why the ban was improper and harmful to their children's education; as a result of the meeting the only

accommodation the council made was to allow the Pierces to pick up and drop off their children at the gate. *Id.*, ¶¶ 55-56.

That summer, after the school year had ended, the Pierces filed formal complaints with APS and the New Mexico Public Education Department (PED). *Id.*, ¶ 57. **On July 21, after the Pierces had complained to APS and PED, the governing council informed the Pierces that the ban would remain in effect. *Id.*, ¶ 58.** That same day the Pierces attempted to meet with Defendant Henderson (who by this time was the principle) to discuss how they could direct their children's education without having access to the campus or the ability to communicate with their children's teachers, but Defendant Henderson refused to meet. *Id.*, ¶¶ 59-60.

On July 24 the Pierces and Defendant Henderson finally met. *Id.*, ¶ 61. **Defendant Henderson repeatedly mentioned the PED complaint against her. *Id.*** When Defendant Henderson expressed a willingness to lift the ban, the Pierces dropped their complaint against her. *Id.* They then agreed to meet again on August 7, before the beginning of the new school year, to forge a new path. *Id.*

**On July 31, when Mrs. Pierce asked if Ms. VanDerMey was still employed at the school, Defendant Henderson stated that the inquiry was inappropriate and the sanctions would remain in effect. *Id.*, ¶ 62.** Because of the ban the Pierces had to seek permission to attend "meet the teacher" night and to deliver school supplies to their children's classrooms. *Id.,* ¶¶ 63-64. **The Pierces did not cause any disruption while on campus, yet on August 5, Defendant Henderson threatened to call the police if they were on campus again. *Id.,*¶ 67.**

On August 6 the Pierces attended an APS Board meeting to discuss their experience at AKCS. *Id.*, ¶ 69. **On August 7 Defendant Henderson cancelled the previously agreed to meeting with the Pierces.** *Id.*, ¶ 70. On August 15 the Pierces again sought help from APS's charter school representatives, but APS refused to help. *Id.*, ¶¶ 71-72.

On August 13 Ms. Pierce contacted Ms. Henderson to reschedule the meeting between them. *Id.*, ¶ 73. In her reply, *Defendant Henderson repeatedly mentioned the complaints to APS and PED and suggested the ban was related to the complaints. Id. She threatened the Pierces by making clear that their relationship depended on the Pierces not making any additional complaints. Id.* Defendant Henderson also admonished Dr. Pierce for taking video and pictures of the AKCS campus. *Id.*, ¶ 74. Nevertheless Defendant Henderson agreed to meet with the Pierces. *Id.* The meeting was scheduled for August 18.

*On August 15, Ms. VanDerMey filed for a restraining order against the Pierces, which was immediately denied. Id.*, ¶¶ 76-77. *Defendant Henderson subsequently cancelled her August 18 meeting with the Pierces. Id.*, ¶ 79. *On August 21 the AKCS governing council reissued the banning letter to the Pierces. Id.*, ¶ 80. *That same day Ms. Pierce contacted Defendant Romero to inquire about the school's interest in mediation (which he had promised to do in May), but Defendant Romero responded by shutting down all future communications with the Pierces and the board and threatening that any further communications from the Pierces would be construed as cyber-bullying. Id.*, ¶ 81.

*On August 25, the school's security guard physically restrained Mrs. Pierce while she was on campus to pick up her children (which she was permitted to do under the banning order). Id.*, ¶ 86. Mrs. Pierce called the police to report the incident. *Id.* The Pierces later learned that *Defendant Henderson had contacted the police before Mrs. Pierce had even arrived on campus, which established that the entire incident was premeditated and intended to cause a scene. Id.*, ¶ 89. *On August 26, a day later, Defendant Henderson informed the Pierces that their children had been expelled from school. Id.*,, ¶ 90.

At the restraining order hearing on August 27, *Ms. VanDerMey admitted that she filed the restraining order because of the Pierces' complaints to the AKCS board, PED, APS board, and APS charter school director, and that she was afraid that the Pierces inquiry about her status as a teacher would lead to further complaints against her.* The judge denied Ms. VanDerMey's request for a restraining order. *Id.*, ¶¶ 91, 95. On August 28, the Pierces were charged with criminal trespass, but the charges were eventually dismissed. *Id.*, ¶¶ 92-94.

## II.     STANDARD OF REVIEW

The Individual School Defendants have a very high burden to meet in order to prevail at this very early stage of the litigation. "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). "In reviewing a Rule 12(b)(6) motion in the context of qualified immunity, a district court should not dismiss a complaint 'for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief.'" *Id.* (quoting *Currier v. Doran*, 242 F.3d 905, 917 (10th Cir. 2001).

The defense cites *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) for the proposition that Section 1983 claims "pose a greater likelihood of failure in notice and plausibility because they typically include complex claims against multiple defendants." Defs' Motion to Dismiss [Doc. 44] at 6. This does not mean, however, that the notice requirement is heightened for Section 1983 cases. The *Twombly*[3] standard is the same whether a qualified immunity defense is asserted or not. *Robbins*, 519 F.3d at 1249. Rather, "[t]o 'nudge their claims across the line from conceivable to plausible,' in this context, plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time. This requires enough allegations to give the defendants notice of the theory under which their claim is made." *Id.* (quoting *Twombly*, 550 U.S. at 570.

## II.     ARGUMENT

### A.     The law of qualified immunity.

Qualified immunity protects government actors from lawsuits for damages if their conduct did not at the time violate a "clearly established" right. When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated a constitutional or statutory right; and (ii) that the right was clearly established at the time of the misconduct. *Riggins v. Goodman*, 572 F.3d 1101,

---

[3] *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007).

1107 (10th Cir. 2009); *Mocek v. City of Albuquerque*, 2013 WL 312881, *33 (D.N.M.

January 14, 2013).

It is important in the context of clearly established law that the Tenth Circuit

cautions against applying this standard too literally:

> [W]e have recently recognized that the concept of clearly established law
> should not be applied too literally. Thus, "[w]e have never said that there
> must be a case presenting the exact fact situation at hand in order to give
> parties notice of what constitutes actionable conduct." Instead, we merely
> require the parties to make a reasonable application of existing law to their
> own circumstances.

*SHA ex. Rel. J.A v. Tucumcari School Dist.*, 321 F.3d. 1285, 1288 (10th Cir. 2003)

(quoting *Johnson v. Martin*, 195 F.3d. 1208, 1216 (10th Cir. 1999).

> **B.    Plaintiff's First Amendment's rights were clearly established at the
> time of the retaliatory acts, and the facts alleged in the complaint
> are sufficient to establish a violation of those rights.**

In their Motion to Dismiss, the Individual School Defendants **do not** argue that

Plaintiffs First Amendment rights are not clearly established; nor can they. "Official

reprisal for protected speech offends the Constitution because it threatens to inhibit [the]

exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see also*

*Glover v. Mabrey*, 384 Fed. Appx. 763, 768 (10th Cir. 2010) ("It is well-established the

First Amendment bars retaliation for protected speech.") (internal citation and quotations

omitted); *O'Boyle v. Sweetapple*, __F. Supp. 3d __, 2016 WL 2868915 (S.D. Fl. May 17,

2016) ("Retaliation against the exercise of First Amendment rights is a well-established

basis for section 1983 liability."). To establish a retaliation claim outside the employment

context, the following must be shown: "(1) that the plaintiff was engaged in

constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to

suffer an injury that would chill a person of ordinary firmness from continuing to engage

in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to plaintiff's exercise of constitutionally protected activity." *Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1203 (10th Cir.  2007). The Individual School Defendants' Motion to Dismiss does not address any of these factors. [4]

The Defendants instead argue that the individual retaliatory acts alleged in the complaint were not themselves unconstitutional. This, however, is not the law. For it has long been established that "[a]n act taken in retaliation for the exercise of a protected right is actionable under [Section] 1983 even if the act, when take for a different reason, would have been proper." *See DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) (quoting *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984) ("The unlawful intent inherent in such a retaliatory action places it beyond the scope of a police officer's qualified immunity if the right retaliated against was clearly established."); *see also Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001) ("Conduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason."); *Whittie v. City of River Rouge*, 2015 WL 4935562 (E.D. Mich. August 18, 2015) ("An act taken in retaliation for the exercise of a constitutionally protected right is actionable even if the action would have been proper if taken for a different reason.") (internal citations and quotation omitted).[5]

---

[4] If the Individual School Defendants in their reply brief address for the first time the three-factor test announced in *Shero*, Plaintiffs reserve the right to file a sur-reply. In any event, it would be improper for the Individual School Defendants' to attempt to bootstrap a new argument into its Motion to Dismiss where it had a full and complete opportunity to timely raise this issue.

[5] All of the arguments made in the Individual School Defendants' Motion to Dismiss are irrelevant because they misconstrue the nature of the Plaintiffs' claims. Plaintiffs have brought a First Amendment retaliation claim – not a claim seeking a declaration that their

The Individual School Defendants completely ignore the most relevant factor for this Court to consider – the retaliatory intent of the Defendants. *See Thompson v. Ohio State University*, 990 F. Supp. 2d 801, 812 (S.D. Ohio 2014) ("In the context of a retaliation claim, the focus on the qualified immunity analysis is on the retaliatory intent of the defendant."); *Lodato v. Ortiz*, 314 F. Supp. 379, 386 (D.N.J. 2004) ("Ordinarily, subjective intent is not relevant to determining whether an official is entitled to qualified immunity. However, in a retaliation claim the official's intent is central to the first question of whether the [plaintiff] states a claim for the violation of a constitutional right."). The Tenth Circuit has adopted a modified qualified immunity analysis in the context of a First Amendment retaliation claim. *See McBeth v. Himes*, 598 F.3d 708, 724 (10th Cir. 2010). What this means then, at least at the summary judgment stage, is that the Defendants "must make a prima facie showing of the objective reasonableness of the challenged conduct." *Id.*

> In the context In the context of a First Amendment retaliation claim, that determination turns on an inquiry into whether officials reasonably could believe that their motivations were proper even when their motivations were in fact retaliatory. Even assuming that this could be demonstrated under a certain set of facts, it is an inquiry that cannot be conducted without factual determinations as to the officials' subjective beliefs and motivations, and thus cannot properly be resolved on the face of the pleadings, but rather can be resolved only after the plaintiff has had an opportunity to adduce evidence in support of the allegations that the true motive for the conduct was retaliation rather than the legitimate reason proffered by the defendants.

*Larsen v. Senate of Com. of Pa.*, 154 F.3d 82, 94 (3d Cir. 1998).

But where a defendant chooses instead to seek relief without taking any discovery, rarely can they succeed in achieving dismissal unless the complaint is so

---

children had a right to attend the charter school or that the Pierces themselves should have been let on campus wihout restriction.

devoid of factual allegations that a retaliation claim is not plausible. *See, e.g., Safepath Sys. LLC v. New York City Dep't of Educ.*, 563 F. App'x 851, 857 (2d Cir. 2014) ("Given the chronology of events as alleged, we conclude that there are questions of fact as to retaliatory intent that cannot properly be determined on a motion to dismiss."); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) ("While a bald and uncorroborated allegation of retaliation might prove inadequate to withstand a motion to dismiss, it is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred."); *Hudson v. MacEachern*, 94 F. Supp. 3d 59, 68 (D. Mass. 2015) ("At the motion to dismiss stage, intent, in some circumstances, can be inferred from a chronology of events which may support an inference of retaliation.") (internal citation and quotations omitted). Indeed, the modified qualified immunity test is not appropriate at the motion to dismiss phase because "[a] determination as to whether a defendant would have taken the same action in the absence of the protected activity is premature when the parties have not conducted any discovery." *Gibbons v. McBride*, 124 F. Supp. 3d 1342, 1375 (S.D. Ga. 2015).

Lastly, the Individual School Defendants challenge some of the allegations in the complaint on the basis that they are not sufficiently detailed or alternatively are insufficient to establish an inference of retaliation. In support, the defense cites *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014) for the proposition that "[t]emporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of retaliatory motive." *See* Defs' Motion to Dismiss at 14. The defense fails to mention, of course, that the Tenth Circuit announced this rule in the context of summary judgment. *See Trant*, 754 F.3d at 1170 ("At the summary

judgment stage, some facts must demonstrate the defendants acted on the basis of a culpable subject subjective stand of mind[.]") (internal citations and quotation omitted).

Here, the Individual School Defendants are seeking to dismiss a factually dependent claim based on qualified immunity before any discovery has taken place. In this context, "the fact that an allegedly adverse action occurred in close proximity to the protected conduct will suffice to prevent dismissal on the pleadings[.]" *Guillory v. Ellis*, 2012 WL 2755296, *5 (N.D.N.Y. March 22, 2012); *see also BEG Investments, LLC v. Alberti*, 144 F. Supp. 3d 16, 23 (D.D.C. 2015) ("But for purposes of this motion to dismiss, because the close temporal proximity of the protected behavior and the alleged retaliation suggest that a causal relationship exists between the two, no more is necessary to survive Rule 12(b)(6) dismissal.") (internal citation and quotations omitted); *Morey v. Somers Cent. School Dist.*, 2007 WL 867203, *12 (S.D.N.Y. March 21, 2007) ("Considering the close temporal proximity and plaintiff's allegations of defendants' improper motive, plaintiff has alleged sufficient facts, that if proven, would establish a causal connection between his First Amendment speech and the adverse employment action. Under these circumstances, it would be inappropriate to resolve this issue on a motion to dismiss.").

Plaintiffs have cited more than enough facts to establish a casual connection (or temporal proximity) between the protected speech and retaliatory acts.

1.   *Connection between the Pierces' protected speech and Defendant Chene's retaliatory acts.*

On April 10 Mrs. Pierce asked Defendant Chene how she could contact the governing council, and also informed APS that she was dissatisfied with the school's handling of the bullying complaints. *See* Amended Complaint, ¶ ¶ 22, 23. Between April

10 and 21, the Pierces contacted the governing council numerous times. *Id.*, ¶ 27. On

April 22, at a meeting set up by Defendant Romero between the Pierces and Defendant

Chene, Defendant Chene laughed at the Pierces for suggesting the school had not

conducted an investigation of the bullying allegations and threatened to remove the

Pierces' children from the school. *Id.*, ¶ 33. On April 23, a day after the meeting,

Defendant Chene contacted the police to complain about the Pierces. *Id.*, ¶ 36. She also

admitted to conspiring to expel the Pierces' children from the school in order to "put an

end to the issues with [Dr. Pierce] and his wife." *Id.*, ¶ 38. On April 24, Defendant Chene

informed Mrs. Pierce that she could not escort her children on campus. *Id.*, ¶ 40. On April

25, Defendant Chene sent the Pierces a letter banning them from the campus and

threatening to expel their children. *Id.*, ¶ 41. Defendant Chene's retaliatory acts were

taken within a few weeks of the Pierces' protected speech. This demonstrates a

sufficiently close connection to withstand dismissal.

> 2.   *Connection between the Pierces' protected speech and Defendant*
> *Romero's retaliatory acts.*

From as early as April 2014 Defendant Romero, the governing council president,

knew the Pierces were dissatisfied with the school's response to the bullying problems.

*Id.*, ¶ 27. On April 23, Mrs. Pierce wrote an email to Defendant Romero informing him of

the results of her meeting with Defendant Chene, including describing Defendant

Chene's behavior. *Id.*, ¶ 23. On April 30, the Pierces sought to speak at a governing

council meeting, but before they spoke and in order to keep the Pierces concerns from

being aired publicly, Defendant Romero offered mediation on behalf of the school. *Id.*, ¶¶

45-46. Rather than conducting the mediation as promised, on May 19 Mr. Romero

informed the Pierces the governing council would hold a special meeting to discuss the

campus banning decision. *Id.*, ¶ 55. During the summer of 2014 the Pierces lodged

complaints about the school with APS and PED. *Id*, ¶ 57. On August 6, the Pierces spoke

at an APS board meeting about their concerns with the school. *Id.*, ¶ 69. In early August

the Pierces sought help from APS to resolve their dispute with the AKCS administration.

*Id.*, ¶¶ 71-72. In mid-August the Pierces sought assistance from the City of

Albuquerque's mediation program. *Id.*, ¶¶ 75-76. On August 21, the Pierces contacted

Defendant Romero to mediate their dispute. *Id.*, ¶ 76.

In early April 2014, the school contacted police to complain about the Pierces. *Id.*,

¶¶ 36-39. Around the same time, the Pierces received a letter from the school's attorney

notifying them that they were not allowed on the school's campus. *Id.*, ¶ 50. After the

May 21 special meeting, the AKCS board upheld the campus ban. *Id.*, ¶¶ 55-56. On July

21, the AKCS board once again upheld the Pierces' ban. *Id.*, ¶ 58. On August 21,

Defendant Romero sent the Pierces an email shutting down all communication with them

and accusing them of cyber-bullying. *Id.*, § 81. As council president, Defendant Romero

personally participated in the various decisions to ban the Pierces from campus. As

explained by the Tenth Circuit, "[p]ersonal involvement does not require direct

participation because § 1983 states 'any official who 'causes' a citizen to be deprived of

her constitutional rights can also be held liable." *See Dodds v. Richardson*, 614 F.3d

1185, 1195 (10th Cir. 2010) (quoting *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279

(10th Cir. 2008)).  As established in the complaint, Defendant Romero personally

participated in virtually every aspect of the banning decision, and took adverse action

against the Pierces whenever they criticized the school.

> 3.  *Connection between the Pierces' protected speech and Defendant Henderson's retaliatory acts.*

Defendant Henderson was also personally involved in several of the retaliatory acts taken against the Pierces. She was present at the meeting between Defendant Chene and Mrs. Pierce on April 22. *id.*, ¶ 37, and was vice principle when Ms. Chene contacted police in April 2014, *id.*, ¶¶ 36-38. She knew of the banning order issued by Defendant Chene. *Id.*, ¶ 42. During the summer of 2014 the Pierces filed a complaint about Defendant Henderson with APS and the PED. *Id.*, ¶ 57. On July 31, Mrs. Pierce asked Defendant Henderson whether Ms. VanDerMey taught at the school. *Id.,* ¶ 62. On August 6 the Pierces spoke an APS board meeting about AKCS. *Id.*, ¶ 70. On August 14 or 15, the Pierces sought to use the City of Albuquerque's mediation program. *Id.*, ¶ 74. On August 21 the Pierces again sought help from APS. *Id.*, ¶ 83. On August 25, Mrs. Pierce was physically restrained by the school security guard while dropping off her children. *Id.*, ¶¶ 85-86.

On April 28, shortly after the issuance of the banning order, Defendant Henderson accosted Mrs. Pierce for entering the campus to drop her children off at school in violation of the banning order. *Id.* On July 21, Defendant Henderson met with the Pierces and insisted that they drop the complaints against her in order to resolve the banning order. *Id.*, ¶ 61. On August 1, Defendant Henderson informed the Pierces that it was improper for them to ask about Ms. VanDerMey's status at the school and advised them the ban would remain in effect. *Id.*, ¶ 62. On August 7, Defendant Henderson cancelled her meeting with the Pierces (the day after the Pierces had spoken at an APS board meeting). *Id.*, ¶ 70. On August 14, Defendant Henderson wrote an email to the Pierces explaining that she would only meet with them if they did not complain every time the school did not meet their expectations. *Id.*, ¶ 73. On August 18, Defendant Henderson

cancelled her meeting with the Pierces. *Id.*, ¶ 78. On August 25, Defendant Henderson contacted police before Mrs. Pierce had reached the school. *Id.*, ¶ 89. On August 27, Defendant Henderson notified the Pierces their children had been disenrolled from the school. *Id.*, ¶ 90. Each of the retaliatory acts occurred in close proximity to the Pierces' constitutionally protected activities.

In short, the Pierces' complaint alleges more than enough facts to state a plausible claim of First Amendment retaliation against each of the Individual School Defendants. The Defendants are clearly on notice of the claims against them. To obtain a dismissal the Individual School Defendants are urging this Court to ignore the weight of authority that disfavors dismissal in First Amendment retaliation cases where the chronology of events shows a temporal proximity between the retaliatory behavior and the protected speech. For these reasons this Court should deny the Individual School Defendants' Motion to Dismiss the First Amendment retaliation claim.

**C.      The Individual School Defendants' violated the Pierces' due process rights by depriving them of a reasonable opportunity to contest the banning order and the restrictions placed on their ability to meaningfully be involved in their children's education.**

The Pierces' due process claims invokes two well-established constitutional principles. The first is that parents have a fundamental liberty interest in controlling the direction of their children's education. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000) ("[W]e have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). The second is that where a significant constitutional right is at stake, ample procedural safeguards should be put in place to safeguard against their abuse. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The

fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (internal citation and quotations omitted).

In this case the complaint without question establishes that the Individual School Defendants placed insurmountable hurdles on the Pierces' ability to participate in their children's schooling. They were unable to set foot on campus except under very stringent controls; they had to ask for permission to drop off supplies in their children's classroom; they were directed not to speak with their daughter's teacher; and each time they complained to oversight authorities about the inadequacies of the school the Individual School Defendants retaliated against them.

The defense improperly seeks to oversimplify the nature of the due process claim. It is not merely that the Pierces were unable to access the campus – it is that they were unable to participate in their children's education at the AKCS to any meaningful degree. And what is worse, the Individual School Defendants deprived the Pierces of their constitutional rights before giving them notice and a meaningful opportunity to contest the ban and no contact order. The Supreme Court has expressed that the "root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant [liberty] or property interest." *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). That did not happen here. The Pierces were not given an opportunity to meet with the governing council until after the restrictions were in place.

The Court has before it a genuine factual dispute – one that cannot and should not be determined by a Rule 12(b)(6) motion – which is whether under the facts as alleged in the complaint the Pierces were given fair notice and a meaningful opportunity to be

heard. It is not enough, as the defense suggests, for this Court to hold that the procedures were fair merely because the Pierces were on one occasion given an opportunity to address the board at a special meeting. The Pierces had two days to prepare for the hearing and did the best they could under the circumstances. But even if the Pierces had been given a meaningful opportunity to contest the order, it likely would not have made much difference.

The ban had already been in place for several weeks before the Pierces met with the governing council. The Defendants ordinarily renewed the banning and no contact order whenever the Pierces criticized the school to third parties. The temporal proximity of the renewal of the banning orders with the Pierces' public criticisms of the school should alone call into question the fairness of the lone meeting with the governing council.

Even when the Pierces were given the opportunity to meet with the governing council, they had two days to prepare and virtually no notice about the allegations against them. As the complaint makes clear, the Pierces stood no real chance of having the ban lifted under these circumstances. The facts and circumstances as alleged in the complaint demonstrate that the Pierces should have been given additional procedural safeguards to contest the ban. For these reasons they have stated a plausible due process claim so the motion should be denied.

## III.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny the Individual School Defendants' Motion to Dismiss.

Respectfully Submitted,

*/s/ Vincent J. Ward*_____
Vincent J. Ward
Frank T. Davis
Freedman Boyd Hollander Goldberg Urias
& Ward, PA
P.O. Box 25326
Albuquerque, NM  87125
Phone: (505) 842-9960
Fax:    (505) 842-0761

   and

Leon Howard
Law Office of Lucero & Howard, LLC
P.O. Box 25391
Albuquerque, New Mexico 87125
505-225-8778 Fax: 505-288-3473
leon@lawoffice-lh.com

*Attorneys for Plaintiffs*

**Certificate of Service**

   I hereby certify that on the 25th day of July 2016, I filed the foregoing electronically through the CM/ECF system which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Henry F. Narvaez
Carlos Romero
Narvaez Law Firm, PA
*Attorneys for Defendants Connie*
*Chene, Tamara Henderson, and*
*Carlos Romero*
P.O. Box 25968
Albuquerque, NM 87125

*/s/* Vincent Ward_____