IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

VERONICA PIERCE AND FLINT PIERCE,

      Plaintiffs,

vs.                                       1:15-cv-758 LF-KBM

CONNIE CHENE, SHAY VANDERMEY,
TAMARA HENDERSON, CARLOS ROMERO,
all in their individual capacities,
AND THE GOVERNING COUNCIL FOR
ALICE KING COMMUNITY SCHOOL,

      Defendants.

## **MEMORANDUM OPINION AND ORDER**

      This matter comes before the Court on defendants Connie Chene, Tamara Henderson, and Carlos Romero's (hereafter sometimes referred to collectively as "Individual School Defendants") Motion to Dismiss Based on Qualified Immunity (Doc. 44) and defendant Alice King Community School (AKCS) Governing Council's Motion to Dismiss Breach of Contract Claim (Doc. 53). Plaintiffs Veronica and Flint Pierce oppose both motions. Docs. 54, 55. Having considered the parties' submissions and the relevant law, I GRANT in part and DENY in part the Individual School Defendants' Motion to Dismiss Based on Qualified Immunity. I GRANT AKCS's Motion to Dismiss Breach of Contract Claim.

## I.    **Factual Background**

      In ruling on a motion for judgment on the pleadings, the Court must accept as true all facts alleged in the amended complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). It also must view these factual allegations in the light most favorable to the

plaintiffs.  *See id.*  Viewing the facts alleged in the amended complaint in this manner, the amended complaint establishes the following:

Shay VanDerMey was a teacher at AKCS.  Doc. 10 at 2, ¶ 5.[1]  The daughter of plaintiffs Veronica and Flint Pierce attended AKCS, and Ms. VanDerMey was their daughter's teacher for the 2013–2014 academic year.  *Id.* at 4, ¶¶ 1, 4.  The Pierces' son also was enrolled at AKCS for the 2013–2014 academic year.  *See id.* at 4, ¶1.  Defendant Connie Chene was the principal at AKCS, defendant Tamara Henderson was the vice principal,[2] and defendant Carlos Romero was the president of the AKCS Governing Council.  *Id.* at 2, ¶¶ 4, 6, 7.

In early February 2014, Mr. Pierce contacted Ms. VanDerMey and informed her that his daughter had complained that another student had been harassing her for several months.  *Id.* at 4, ¶ 5.  Ms. VanDerMey responded that she had not seen any of the harassment, but that the other student came off "harsh at times."  *Id.* at 4, ¶ 6.  Shortly thereafter, Ms. VanDerMey informed Mrs. Pierce that the other student had written the Pierces' daughter a "heartfelt note of apology."  *Id.* at 5, ¶ 7.

Later in February, Mrs. Pierce informed Ms. VanDerMey that her daughter still was complaining that the other student was bullying her.  *Id.* at 5, ¶ 8.  Mrs. Pierce suggested that Ms. VanDerMey speak to the other student's parents.  *Id.*  The following day, Ms. VanDerMey responded to Mrs. Pierce by stating that in her view, both students were at fault.  *Id.* ¶ 9.  Mrs. Pierce was surprised by this response as she was extremely involved in her daughter's education, and Ms. VanDerMey had never before reported that the Pierces' daughter had misbehaved.  *Id.*

[1] The amended complaint has numbered paragraphs, but numbers 1 through 8 are used twice, first on pages 1 to 2, and again on pages 4 to 5.  For the first eight paragraphs, this order will refer to both the page number and the paragraph number.  For all paragraphs after 8, it will refer to just the paragraph number.

[2] Ms. Henderson became the principal of AKCS at the beginning of the 2014–2015 academic year.  Doc. 10 ¶ 58.

However, Mrs. Pierce "was denied the opportunity to speak to Ms. VanDerMey" to discuss the issue when she picked her daughter up from school that day. *Id.* ¶ 10.

Mrs. Pierce later learned that both her daughter and the other student were sent to Ms. Chene's office on February 26, 2014, and were directed to apologize to one another. *Id.* Ms. Chene had the Pierces' daughter sit on her lap. *Id.* The Pierces' daughter was crying and uncomfortable during the entire exchange. *Id.* Five days later, on March 3, 2014, the Pierces met with Ms. Chene and Ms. Henderson. *Id.* ¶ 11. Ms. Chene acknowledged that the Pierces' daughter had cried when she was sent to the principal's office on the 26th, and that Ms. Chene had had their daughter sit on her lap. *Id.* Ms. Chene informed the Pierces that the other student had stayed in her office after their daughter left, and that she had a more stern conversation with the other student. *Id.* Ms. Chene also said that the other student "gets in trouble a lot." *Id.*

In mid-March 2014, the Pierces had a parent-teacher conference with Ms. VanDerMey. *Id.* ¶ 12. Ms. VanDerMey did not express any concern at this conference about the behavior of the Pierces' daughter. *Id.* She only complimented their daughter's behavior and academic performance. *Id.*

After the parent-teacher conference and continuing until April 1, 2014, the other student continued to bully the Pierces' daughter, and the Pierces' daughter reported each incident to Ms. VanDerMey. *Id.* ¶ 13. When Mrs. Pierce tried to contact Ms. VanDerMey to discuss a particular threat by the other student, Ms. VanDerMey did not respond. *Id.* On April 8, 2014, the Pierces' daughter reported that Ms. VanDerMey had made fun of her for picking her nose in class. *Id.* ¶ 14. When Mrs. Pierce sought clarification from Ms. VanDerMey regarding this incident, Ms. VanDerMey did not respond. *Id.* On April 9, 2014, Ms. VanDerMey emailed Mrs. Pierce and suggested that it might be in Mrs. Pierce's daughter's best interest to move to

3

another classroom. *Id.* ¶ 18. The same day, when Mrs. Pierce went to pick her children up from school, she spoke to the other student's father about the conflict between her daughter and his son. *Id.* ¶ 19. The other student's father said that Ms. VanDerMey had told him that the Pierces' daughter was picking on his son and was fabricating the bullying allegations. *Id.* Ms. Chene interrupted the conversation and prevented its continuation, even though it had been cordial. *Id.* ¶ 20. When the father of the other student suggested that it might be best for his son to move to another class, Ms. Chene put her arm around his son and said that he would not have to move to another class although the school was considering moving the Pierces' daughter to another class. *Id.* ¶ 21.

Also on April 9, 2014, Mrs. Pierce emailed Ms. Chene and informed her that Ms. VanDerMey was not responding to her requests to meet. *Id.* ¶15. Mrs. Pierce requested a meeting with Ms. Chene. *Id.* Ms. Chene said that she could only meet after spring break, which was set to begin on April 10, 2014. *Id.* ¶ 16.

On April 10, 2014, Mrs. Pierce asked Ms. Chene how she could contact the school board. *Id.* ¶ 22. The same day, Mrs. Pierce reported "to APS [Albuquerque Public Schools] concerning the manner in which the Pierces' complaints of bullying were being handled." *Id.* Between April 10 and April 21, 2014, the Pierces attempted to contact the AKCS Governing Council several times "about the way the school was shutting down their attempts to resolve the bullying of their daughter." *Id.* ¶ 27. On April 22, 2014, Mr. Romero wrote to Mrs. Pierce and recommended that the Pierces schedule a meeting with Ms. Chene, and that "the school board supports the voluntary resolution of conflict." *Id.* ¶ 28.

On April 15, 2014, Ms. Chene sent an email to the Pierces instructing them to end all communication with Ms. VanDerMey. *Id.* ¶ 26. On April 22, 2014, after the Pierces' daughter

reported another instance of bullying, Mrs. Pierce approached Ms. Chene and started to tell her about the new incident. *Id.* ¶¶ 29, 30. Ms. Chene responded that she had nothing else to speak to Mrs. Pierce about, and Mrs. Pierce left the school. *Id.* ¶ 30.

Later on April 22, 2014, the Pierces met with Ms. Chene, Ms. Henderson, and the school secretary to discuss the bullying issue. *Id.* ¶¶ 31, 32, 35. When Mr. Pierce complained that no investigation had been done into his daughter's allegations of bullying, Ms. Chene laughed. *Id.* ¶ 33. When Mr. Pierce asked why she was laughing, Ms. Chene said it was because none of the allegations were true. *Id.* "The meeting ended with the Pierces being threatened that they could be removed from the school for 'disrupting the educational environment.'" *Id.* Following the meeting, Mrs. Pierce sent an email to Mr. Romero to report the new bullying incident, Ms. Chene's initial refusal to speak to her, the meeting and Ms. Chene's laughing at them, and the threat to ban them from the AKCS campus. *Id.* ¶ 35.

The next day, on April 23, 2014, an Albuquerque Police Department (APD) officer informed the Pierces that Ms. VanDerMey and Ms. Chene were afraid of violence. *Id.* ¶ 36. The APD officer's incident report, however, revealed that the officer told Ms. VanDerMey and Ms. Chene that the Pierces' emails and their meeting with Ms. Chene and other school officials the previous day did not amount to harassment. *Id.* ¶ 37. Specifically, the officer stated, "I advised them [Ms. VanDerMey and Ms. Chene] that based on what was being described to me, the emails did not rise to the level of harassment. I also advised [Ms. Chene] that her raising her voice towards [Mr. Pierce] did not rise to the level of harassment either." *Id.* Ms. Chene told the officer that the school was considering disenrolling the Pierces' children, but Ms. Chene did not want the officer to convey this information to the Pierces because it would inflame them further. *Id.* ¶ 38. According to the amended complaint, Ms. VanDerMey and Ms. Chene's report to the

APD officer "was a clear attempt to retaliate against the Pierces, was a misuse of the criminal process, and [] was just a step in their scheme to disenroll the Pierces' children from school because the Pierces never exhibited any violent behavior whatsoever." *Id.* ¶ 39.

On April 24, 2014, Mrs. Pierce attempted to walk her children to their classrooms, but Ms. Chene prevented her from doing so. *Id.* ¶ 40. Ms. Chene told Mrs. Pierce that she was not allowed to escort her children on campus. *Id.* The next day, the Pierces received a letter from Ms. Chene dated April 22, 2014, but postmarked April 24, 2014. *Id.* ¶ 41. The letter stated that an investigation into the bullying allegations had been completed, and that the allegations were determined to be unfounded. *Id.* The letter also threatened to disenroll the Pierces' children from school, and it prohibited the Pierces from dropping off and picking up their children except by using the drive-through procedure outlined by the AKCS administration. *Id.*

On April 28, 2014, Ms. Henderson approached Mrs. Pierce as she was dropping off her children and insisted that she was not permitted on school grounds. *Id.* ¶ 42. After the encounter, Ms. Henderson sent an email to the school board, with a copy to the Pierces, entitled "parental refusal to follow administrative request." *Id.*

The Pierces were unable to communicate with anyone at AKCS regarding their children's education. *Id.* ¶ 43. When Mrs. Pierce sent her children's teachers questions about standardized testing, her questions went unanswered. *Id.* Mrs. Pierce sent an email to Ms. VanDerMey complaining that it was not fair to the Pierces' daughter for Ms. VanDerMey to cut off all communication. *Id.* At the end of April, AKCS sent an email to the parents of all children in Ms. VanDerMey's class that Ms. VanDerMey was cutting off all communication via email with parents. *Id.* ¶ 44. This closed off all communication between Ms. VanDerMey and

the Pierces; by this time the Pierces were not allowed to write to Ms. VanDerMey, nor were they allowed on campus. *Id.*

Since about April 10, 2014, the Pierces had requested that their problems with the AKCS administration and staff be mediated. *Id.* ¶ 45. By April 30, 2014, the Pierces had not received a response regarding their request for mediation so Mr. Pierce asked to speak at a governing council meeting that was scheduled to take place the following day. *Id.* Mr. Romero granted Mr. Pierce's request, but told him that he would have to limit his remarks to three minutes, and could not mention AKCS administrators or staff members by name. *Id.* Later on April 30, 2014, Mr. Romero offered the Pierces the opportunity to mediate their grievances, and promised that the mediation would take place the following week. *Id.* ¶ 46. The Pierces agreed to the mediation, and "[a]s a conciliatory measure, [they] decided not to air their grievance public[]ly at the governing council meeting" the following day. *Id.* On May 2, 2014, Mr. Pierce sent an email to Mr. Romero inquiring when the mediation would take place. *Id.* ¶ 47.

On May 5, 2014, Mrs. Pierce and her son were waiting for her daughter to be released from class on a curb outside of AKCS. *Id.* ¶ 48. Mrs. Pierce's son was released from school ten minutes before her daughter. *Id.* Ms. Henderson approached Mrs. Pierce and informed her—in front of another parent and child—that she was not permitted to wait for her daughter on the curb. *Id.* Following this incident, the Pierces sent another email to Mr. Romero pleading with him to schedule the mediation so that they could resolve the issues surrounding the Pierces' ban from the AKCS campus. *Id.* ¶ 49. The same day, Mrs. Pierce found a letter dated April 30, 2014 in her daughter's school folder, written by an attorney, which informed the Pierces that they were not permitted on the AKCS campus. *Id.* ¶ 50. Mr. Pierce asked an APD officer whether the attorney's letter prevented the Pierces from dropping off and picking up their

children from school, and the officer informed them that they were entitled to be on campus for that purpose. *Id.* ¶ 51. On May 6, 2014, based on the APD officer's advice, Mr. Pierce had an APD officer help him escort his children to class. *Id.* ¶ 52. Mr. Pierce learned from the APD officer that Ms. Chene wanted to disenroll his children from AKCS. *Id.* ¶ 53.

On May 19, 2014, Mr. Romero wrote Mr. Pierce to inform him that "AKCS has agreed to have a special meeting on Wed., May 21, 2014 at 5:15 pm," and he asked Mr. Pierce to let him know by noon the next day whether the Pierces would attend. *Id.* ¶ 54. The Pierces attended the meeting and did their best to talk to the governing council about the issues they were having at AKCS. *Id.* ¶ 55. One of the consequences of their ban from the AKCS campus was that their children could not participate in the aftercare program. *Id.* No modification was made to the ban that would permit their children to participate in aftercare. *Id.* After the meeting, a governing council representative informed Mr. Pierce that the ban would remain in place on an interim basis, but that the Pierces could drop off and pick up their children from the school gate. *Id.* ¶ 56.

During the summer of 2014, the Pierces filed formal complaints with APS and the New Mexico Public Education Department (PED) concerning the manner in which Ms. VanDerMey and Ms. Henderson handled the Pierces' bullying reports. *Id.* ¶ 57. On July 21, 2014, Mr. Romero sent the Pierces a letter informing them that the governing council had decided to keep all sanctions imposed by Ms. Chene in place until further notice from the principal. *Id.* ¶ 58. Mr. Romero also told them to direct any questions to Ms. Henderson, who was to become the new principal. *Id.*

On July 24, 2014, the Pierces met with Ms. Henderson and two other AKCS school officials. *Id.* ¶ 61. Ms. Henderson repeatedly mentioned the complaint the Pierces had filed

against her with PED.  *Id.*  But she also expressed a willingness to drop the ban that prevented

the Pierces from entering the AKCS campus.  *Id.*  Ms. Henderson and the Pierces scheduled a

follow-up meeting for August 7, 2014 because Ms. Henderson did not know about the governing

board's final decision, and she wanted to speak to Mr. Romero about it before getting back to

them.  *Id.*  Following the July 24 meeting, the Pierces dropped their PED complaint against Ms.

Henderson.  *Id.*

        At the end of July, 2014, Mrs. Pierce asked Ms. Henderson whether Ms. VanDerMey still

was employed at AKCS.  *Id.* ¶ 62.  Ms. Henderson told Mrs. Pierce that Ms. VanDerMey was

still at the school.  *Id.*  The next day, Ms. Henderson wrote to Mrs. Pierce to inform her that her

inquiry as to Ms. VanDerMey's employment status was inappropriate, and that the sanctions

against the Pierces would remain in effect.  *Id.*

        In early August, 2014, at the beginning of the new school year, Ms. Henderson informed

the Pierces that they were not allowed onto campus to attend a "meet the teacher" event.  *Id.*

¶ 63.  Despite this, the Pierces attended the event without incident.  *Id.* ¶ 65.  The Pierces also

helped their children carry their new school supplies to their classrooms.  *Id.* ¶ 66.  Following

these incidents, Ms. Henderson sent the Pierces a message that informed them she would contact

the police if they came onto the AKCS campus.  *Id.* ¶ 67.  Ms. Henderson nonetheless gave Mrs.

Pierce permission to drop off some homework her son had left at home at the school.  *Id.* ¶ 68.

On August 6, 2014, the Pierces attended an APS school board meeting and spoke publicly about

their experience at AKCS.  *Id.* ¶ 69.  The next day, Ms. Henderson cancelled the August 7

meeting she previously had scheduled with the Pierces.  *Id.* ¶ 70.

        On August 13 and 14, 2014, Mr. and Mrs. Pierce sent Ms. Henderson separate emails

requesting that she reschedule the meeting that she had cancelled on August 7.  *Id.* ¶ 73.  Ms.

Henderson responded to Mr. Pierce and asked what the purpose of the meeting was.  *Id.*  Mr.
Pierce informed her that the Pierces wanted to discuss their ban from the AKCS campus.  *Id.*
Ms. Henderson rescheduled the meeting for August 18, 2014, but in doing so referenced the
Pierces' complaints to PED and APS and suggested that her relationship with the Pierces
"depended on her knowing that the Pierces would not complain every time her performance did
not meet their expectations."  *Id.*  Ms. Henderson also accused Mr. Pierce of "'filming, and/or
taking still pictures of [the AKCS] community' and admonished him for the fabricated conduct."
*Id.* ¶ 74.  On the day the meeting was rescheduled to take place, Ms. Henderson again cancelled
it.  *Id.* ¶ 78.

On August 15, 2014, Ms. VanDerMey filed an application for a restraining order against
the Pierces in the Bernalillo County District Court.  *Id.* ¶ 76.  Ms. VanDerMey filed the
application despite the fact that the APD officer had told Ms. VanDerMey in April that the
Pierces' actions did not constitute harassment, and despite the fact that nothing of significance
had happened since then.  *Id.*  The only noteworthy event since April had been the Pierces' filing
of their formal complaints against Ms. VanDerMey for the way she had handled their reports of
bullying.  *Id.*  The state district court denied Ms. VanDerMey's request for a temporary
restraining order the same day she filed her application.  *Id.* ¶ 77.  Five days later, an APD
officer informed the Pierces that Ms. VanDerMey had filed an application for a restraining order
against them.  *Id.* ¶ 79.

On August 21, 2014, the governing council reissued its decision to ban the Pierces from
the AKCS campus.  *Id.* ¶ 80.  The same day, Mrs. Pierce wrote Mr. Romero and insisted that he
provide the Pierces the opportunity to mediate their issues as he had promised at the end of
April.  *Id.* ¶ 81.  Mr. Romero responded "by shutting down all future communication with the

governing council," and by informing the Pierces that any further emails from the Pierces to the governing council or any other AKCS staff or employee would be viewed as cyber-bullying.  *Id.*

In response to this situation, the Pierces met with two APS officials who offered to move the Pierces' children to another school.  *Id.* ¶ 82.  The officials told the Pierces that if they did not want to move their children to another school, their case was closed.  *Id.* ¶ 83.  APS could do nothing more.  *Id.*

On August 25, 2014, when Mrs. Pierce was dropping her children off at school and/or picking them up, a woman who represented herself as a police officer physically restrained Mrs. Pierce and prevented her from picking her children up.  *Id.* ¶¶ 85, 86.  While Mrs. Pierce was being restrained, she authorized another parent to retrieve her children.  *Id.* ¶ 87.  But Ms. Henderson and the person who had represented herself as a police officer refused to permit the other parent to retrieve the Pierces' children.  *Id.*  The children were held on the AKCS campus after school and questioned without the Pierces' consent for approximately 90 minutes.  *Id.* ¶ 88. Mrs. Pierce reported this incident to APD.  *Id.* ¶ 86.  The Pierces believe that Ms. Henderson called APD just before Mrs. Pierce arrived to pick her children up, and that Ms. Henderson and the person who represented herself as a police officer intended to cause a scene when Mrs. Pierce arrived.  *Id.* ¶ 89.  The next day, on August 26, 2014, the Pierces received a letter from Ms. Henderson informing them that their children had been disenrolled from AKCS.  *Id.* ¶ 90.

On August 27, 2014, the state district court held a hearing on Ms. VanDerMey's application for a restraining order.  *Id.* ¶ 91.  Ms. VanDerMey accused the Pierces of making false accusations against her, but said she was waiting for information from PED to know what those accusations were.  *Id.*  In describing the accusations, Ms. VanDerMey said,

> Well, I know they've gone to my governing board, the APS board meeting, and used my name.  They have gone to the AP[S] charter director and PED and have,

> you know put claims against me in regards to how I handle myself as a teacher, in regards to these bullying accusations.

*Id.*  The testimony disclosed that Ms. VanDerMey felt harassed and was concerned that the Pierces were inquiring about her continued employment at AKCS because she was worried that the Pierces would pursue sanctions against her, not because of any fear for her safety.  *Id.*  Ms. VanDerMey did not file her application for a restraining order until after she knew that the Pierces had filed a PED complaint against her.  *Id.*  On November 3, 2014, the state district court entered an order dismissing Ms. VanDerMey's application for a restraining order.  *Id.* ¶ 95.

On August 28, 2014, the Pierces were charged criminally in the Bernalillo County Metropolitan Court with trespassing on AKCS property.  *Id.* ¶ 92.  The Pierces allege that Ms. Henderson provided false information, or information with reckless disregard for the truth, to an APD officer, which resulted in the filing of the criminal trespass charges.  *Id.*  On October 9, 2014, the APD officer who filed the charges dismissed the trespass charge against Mrs. Pierce.  *Id.* ¶ 93.  On October 21, 2014, the Metropolitan Court dismissed the trespass charge against Mr. Pierce.  *Id.* ¶ 94.

## II.   <u>The Complaint</u>

Counts I through IV of the amended complaint allege that various individual defendants violated the Pierces' First Amendment rights by retaliating against them when the Pierces complained about the way the individual defendants handled the reported bullying involving the Pierces' daughter.  *See* Doc. 10 ¶¶ 98–119.  The Pierces allege that their complaints were "petitions to the Government for a redress of grievances expressly protected by the First Amendment," *id.* ¶¶ 99, 105, 111, 117, and that the retaliatory acts "would chill an ordinary person" in the exercise of his or her First Amendment rights, *id.* ¶¶ 100, 106, 112, 118.

Count V of the amended complaint alleges that Ms. Chene, Ms. Henderson, and Mr. Romero violated the Pierces' Fourteenth Amendment due process rights by banning them from the AKCS campus, denying them the ability to safely transport their children to and from school, and shutting down means of communication without reasonable notice or a reasonable opportunity to be heard.  *Id.* ¶¶ 120–27.  The Pierces voluntarily dismissed Count VI of the amended complaint.  Doc. 56.  Count VII of the amended complaint alleges that the AKCS Governing Council breached its implied contract with the Pierces by banning them from campus "for reasons outside of the understood scope in which a parent could be banned, without good cause, and without sufficient notice or an opportunity to respond."  Doc. 10 ¶¶ 133–36.

## III.   <u>Discussion</u>

### A.  Motions to Dismiss Generally

"To withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'"  *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir .2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While "'a court must accept as true all of the allegations contained in a complaint,'" this rule does not apply to legal conclusions.  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A] plaintiff must offer specific factual allegations to support each claim."  *Id.* (citation omitted).  A complaint survives only if it "states a plausible claim for relief."  *Id.* (citation omitted).

"Generally, a court considers only the contents of the complaint when ruling on a 12(b)(6) motion."  *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013).  In determining whether to grant the motion, the Court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to the plaintiff.  *Twombly*, 550 U.S. at 555; *Alvarado v. KOB–TV, LLC*, 493 F.3d

13

1210, 1215 (10th Cir. 2007).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556 and *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### B.  Section 1983 Claims and Qualified Immunity Generally

Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  To establish a claim under § 1983, a plaintiff must allege that a defendant acted under color of state law to deprive the plaintiff of a right, privilege, or immunity secured by the Constitution or the laws of the United States.  *West v. Atkins*, 487 U.S. 42, 48 (1988).  "[P]rivate conduct that is not 'fairly attributable' to the State is simply not actionable under § 1983, . . . however discriminatory or wrongful the conduct is."  *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (citations and quotations omitted).  It is "well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state."  *Id*. at 493.  The key question is whether the state employee committed the tort "on account of the authority vested in the employee by the state."  *Id*.  It is the plaintiff's burden to plead, and ultimately establish, "the existence of a 'real nexus' between the defendant's conduct and the defendant's 'badge' of state authority in order to demonstrate action was taken 'under color of state law.'"  *Id*. at 494.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or

constitutional rights of which a reasonable person would be aware.  *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982).  Under the Tenth Circuit's two-part test for evaluating qualified immunity,

the plaintiff must show (1) that the defendant's conduct violated a constitutional or statutory

right, and (2) that the law governing the conduct was clearly established when the alleged

violation occurred.  *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998); *accord*

*Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998).  For a right to be clearly

established, "[t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he [or she] is doing violates that right."  *Anderson v. Creighton*, 483 U.S.

635, 640 (1987).  Unless both prongs are satisfied, the defendant will not be required to "engage

in expensive and time consuming preparation to defend the suit on its merits."  *Siegert v. Gilley*,

500 U.S. 226, 232 (1991).

The Court is not required to address the two prongs of the test in order.  *Pearson v.*

*Callahan*, 555 U.S. 223, 236 (2009).  The Supreme Court's decision in *Pearson* permits courts

to grant qualified immunity without first deciding whether a constitutional violation occurred so

long as the right claimed to be violated was not clearly established.  *Id.*  The right that is alleged

to have been violated must be "clearly established" not just as a general proposition (for

example, in the way the right to free speech is clearly established), but "in a more particularized

. . . sense:  The contours of the right must be sufficiently clear that a reasonable official would

understand that what he [or she] is doing violates that right."  *Anderson*, 483 U.S. at 640.  Stating

the right too broadly would destroy the balance that the Supreme Court has sought to establish

"between the interests in vindication of citizens' constitutional rights and . . . public officials'

effective performance of their duties by making it impossible for officials reasonably to

anticipate when their conduct may give rise to liability for damages."  *Id.* at 639.  "Qualified

immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity therefore protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### 1.   *First Amendment Retaliation Claims (Counts I to IV)*

To state a First Amendment retaliation claim, the Pierces must allege that (1) they were engaged in constitutionally protected activity; (2) the Individual School Defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the Individual School Defendants' adverse actions were substantially motivated as a response to the Pierces' exercise of constitutionally protected conduct. *Shero v. City of Grove, Okla.,* 510 F.3d 1196, 1203 (10th Cir. 2007). The standard for evaluating the chilling effect on the protected speech is objective, not subjective. *Smith v. Plati*, 258 F.3d 1167, 1176–77 (10th Cir. 2001). "[A] trivial or de minimis injury will not support a retaliatory prosecution claim." *Poole v. County of Otero*, 271 F.3d 955, 960 (10th Cir. 2001).

### a.   *Count I—Retaliation Related to Restraining Order Application*

Count I of the amended complaint alleges that Ms. VanDerMey retaliated against the Pierces by filing an application for a restraining order against them. *See* Doc. 10 ¶¶ 76, 99, 100. The Court already has held that the amended complaint failed to allege that Ms. VanDerMey used or misused any state authority she may have possessed in attempting to obtain a restraining order against the Pierces, *see Jojola*, 55 F.3d at 494, and therefore the amended complaint failed to allege that Ms. VanDerMey acted under color of state law. *See* Doc. 38. The amended complaint alleges only that Ms. Chene, Ms. Henderson, and Mr. Romero "aided" Ms. VanDerMey in attempting to obtain a restraining order, Doc. 10 ¶ 101, but does not specifically

allege how any of them used their state authority in attempting to obtain the restraining order. Thus, for essentially the same reasons that the Court held that count 1 of the amended complaint failed to state a claim against Ms. VanDerMey, it also fails to state a claim against Ms. Chene, Ms. Henderson, and Mr. Romero.  Count 1 therefore will be dismissed in its entirety.

### b.  *Count II—Retaliation Related to Ban from AKCS Campus*

Count II of the amended complaint alleges that Ms. Chene retaliated against the Pierces for their complaints to the APS school board and the PED by banning them from the AKCS campus, and that Ms. Henderson and Mr. Romero retaliated against them by continuing the ban. Doc. 10 ¶¶ 103–08.  The individual defendants argue that this count should be dismissed because it is clearly established that parents have no constitutional right to access school grounds.  Doc. 44 at 9.  They also argue that the allegations are insufficiently detailed to show retaliation or the particular acts that each of the individual defendants did to accomplish the ban.  *See id.* at 10. The Pierces respond that the defendants misunderstand the nature of their claim, and that even if they had no constitutional right of access to school grounds, the ban in retaliation for their complaints violated their First Amendment rights to seek redress of their grievances regarding the way the individual defendants were handling their bullying claims.  *See* Doc. 54 at 12–20. Although I agree that the Pierces' analytical framework is correct, the ban from the AKCS campus would not chill a person of ordinary firmness from continuing to seek redress.

There can be no real dispute that the Pierces' complaints to the AKCS governing council, the APS school board, and the PED constituted constitutionally protected activity.  "[A] private citizen exercises a constitutionally protected First Amendment right *anytime* he or she petitions the government for redress."  *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007) (emphasis in original).  Whether the cause is "minor and questionable," or "mighty and

consequential," is irrelevant.  *Id.*; *see also Jenkins v. Rock Hill Local School Dist.*, 513 F.3d 580,

587–88 (6th Cir. 2008) (mothers' complaints to superintendent, newspaper, government officials

and agencies about treatment their children received in schools was constitutionally protected

activity).

It is with respect to the second element of a retaliation claim that count II of the amended

complaint fails.  The Pierces allege that their ban from the AKCS grounds would chill "an

ordinary person" in the exercise of his or her First Amendment rights, but the facts alleged in the

complaint do not support this claim.   Doc. 10 ¶ 106.  The protected activity that the Pierces' say

was chilled was their ability to complain and seek redress from the AKCS governing board, the

APS school board, and PED.  *See id.* ¶ 105.  There are no allegations in the amended complaint

that the ban interfered with the Pierces' ability to communicate with the governing board, the

school board, or PED.  The Pierces attended and spoke at two governing council meetings, filed

formal complaints with the APS school board and PED, attended an APS school board meeting

and spoke publicly about their experience at AKCS, and met with APS officials to discuss the

situation well after the ban took effect.  *See id*. ¶¶ 45, 55, 57, 61, 82.  Thus, the ban would not

chill a person of ordinary firmness from continuing to complain to the relevant school authorities

about the handling of the bullying allegations.  *See Smith*, 258 F.3d at 1177 (although official's

actions may have made it more difficult for plaintiff to obtain information regarding University's

varsity athletic programs, alternative avenues for information remained open; district court

properly dismissed First Amendment retaliation claim); *Lovern v. Edwards*, 190 F.3d 648, 655–

56 (4th Cir. 1999) (parent's ban from school property did not implicate his First Amendment

rights where he "was provided ample opportunity to air his 'corruption' allegations, both to the

school board and in numerous discussion with school officials").  The amended complaint

therefore fails to state a valid First Amendment retaliation claim based on the ban.  Count II will be dismissed.

    c.  *Count III—Retaliation Related to the Facilitation of Criminal Charges Against the Pierces*

Count III of the amended complaint alleges that Ms. Chene and Ms. Henderson "facilitated criminal charges against the Pierces in retaliation for the Pierces' complaints against [them] for the manner in which they handled" the bullying allegations.  Doc. 10 ¶ 110. Defendants argue that the Pierces have not pled sufficient and plausible facts to give Ms. Chene and Ms. Henderson fair notice of the claims against them and have failed to state a First Amendment retaliation claim.  *See* Doc. 44 at 11.  I agree.

The only allegation in the complaint that relates to the "facilitation" of criminal charges against the Pierces is the following:

> 92.    On August 28, 2014, the Pierces were criminally charged in the Bernalillo County Metropolitan Court with trespassing at AKCS.  Based on information and belief, Ms. Henderson provided information she knew was false and/or provided information with reckless disregard as to the statement[']s truth or falsity to an APD officer to ensure criminal process was initiated against the Pierces.

Doc. 10 ¶ 92.  There is no specific allegation that even mentions Ms. Chene, or whether she had anything to do with the criminal charges being filed.  And the allegations against Ms. Henderson fail to state what information she provided to the police officer, or even what information the Pierces believe she provided to the police officer.  Instead, the allegations in the amended complaint establish that following the Pierces' presence on campus in early August, 2014—after the ban was in place—Ms. Henderson warned the Pierces that she would "contact the police when they are on campus."  Doc. 10 ¶¶ 63–67.  The Pierces were well aware that the ban was still in place.  *See id.*  And although the amended complaint is unclear as to what incident led to the trespass charges, it alleges that Ms. Henderson called the police on or about August 25, 2014,

just before Ms. Pierce arrived to pick up her children from school, which "caus[ed] a scene." *See id.* ¶ 89. The criminal trespass charges were initiated three days later. *See id.* ¶ 92. These allegations do not support the inference that Ms. Henderson intentionally lied to a police officer to procure the Pierces' prosecution in retaliation for their complaints against her. *See Nielander v. Board of County Com'rs of County of Republic, Kan.*, 582 F.3d 1155, 1166 (10th Cir. 2009) (county employees who "did not actively initiate any proceedings" but instead "merely provid[e] the police with their account of events commit no constitutional violation at all, as they are not bringing charges"; employees were entitled to qualified immunity on First Amendment retaliation charge). Count III therefore fails to state a First Amendment retaliation claim against Ms. Chene or Ms. Henderson and will be dismissed.

> d. *Count IV—Retaliation Related to the Disenrollment of the Pierces' Children from AKCS*

Count IV of the amended complaint alleges that Ms. Henderson disenrolled the Pierces' children from AKCS in retaliation for their complaints to the governing board, the school board and PED for the way she and other AKCS officials handled the bullying allegations. Doc. 10 ¶¶ 114–19. As already noted, the Pierces' complaints constituted constitutionally protected activity. But, unlike the ban from the school's campus and reporting the Pierces' presence on the AKCS campus to police, disenrolling children from the school of their parents' choice in retaliation for their parents' exercise of First Amendment rights would chill an ordinary person in the exercise of those rights. The ban from the school grounds and the enforcement of that ban did not interfere with the Pierces' ability to voice their complaints to the governing council, the school board, or the PED. However, the disenrollment of their children forced the Pierces to choose between the education they thought best for their children and their First Amendment rights. The disenrollment was not a de minimis injury that merely made it less convenient for

the Pierces to voice their concerns.  Thus, although the Pierces' children did not have a right to attend the school of their choice, once they were enrolled in that school, that benefit could not be taken away based on their parents' complaints about the school.  *See Seamons v. Snow*, 84 F.3d 1226, 1238 (10th Cir. 1996) ("the government may not deny a benefit to a person because of his constitutionally protected interests"; student dismissed from football team because of his speech stated First Amendment retaliation claim); *Jenkins v. Rock Hill Local School Dist.*, 513 F.3d 580, 588–89 (6th Cir. 2008) ("dismissing [child] from school, making a false report to Children Services, and refusing to provide home-school education through the services of a tutor, would chill a person of ordinary firmness from engaging in speech"); *see also Ward v. Athens City Bd. Of Educ.*, 187 F.3d 639 (Table), 1999 WL 623730, at *3 (6th Cir. 1999) (unpublished) ("if the decision not to readmit the Ward girls was made for an impermissibly retaliatory reason, it is actionable under § 1983").

With respect to the third element of a retaliation claim—that the disenrollment was substantially motivated as a response to the Pierces' complaints—the Pierces allege that in mid-August, 2014, Ms. Henderson referred to the Pierces' complaints to PED and APS, and stated to the Pierces that her relationship with them "depended on her knowing that the Pierces would not complain every time her performance did not meet their expectations."  Doc. 10 ¶ 73.  Within the next few days, the Pierces contacted both the AKCS governing board and APS officials in their continuing attempt to mediate their disagreement with the school and have the ban lifted. *Id.* ¶¶ 80–83.  On August 25, 2014, Ms. Henderson called the police when Mrs. Pierce was picking her children up from school, and the next day, Ms. Henderson notified the Pierces that their children had been disenrolled.  *Id.* ¶¶ 89–90.  At the pleading stage, the amended complaint states sufficient facts to make a plausible claim that Ms. Henderson's decision to disenroll the

Pierces' children from AKCS was substantially motivated by the Pierces' continuing complaints surrounding the handling of their bullying allegations and their ban from the AKCS campus. Count IV therefore states a valid First Amendment retaliation claim.

The defendants argue that even if count IV states a valid First Amendment retaliation claim, Ms. Henderson still is entitled to qualified immunity because the law governing her conduct was not clearly established at the time of the alleged violation. *See* Doc. 44 at 13, 15; Doc. 57 at 3–4. Their argument relies entirely on the premise that there is no clearly established constitutional right to attend a charter school. *See id.* The defendants, however, state the right at issue too narrowly. When Ms. Henderson disenrolled the Pierces' children from AKCS, it was a "well established principle that the government may not deny a benefit to a person because of his [or her] constitutionally protected interests." *Seamons*, 84 F.3d at 1238 (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). She therefore is not entitled to qualified immunity at this stage.

To show that the law was clearly established, the Pierces "need not show that the specific action at issue has previously been held unlawful." *Hilliard v. City and County of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991). They need only show that the alleged unlawfulness was apparent in light of preexisting law. *Id.* "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

In *Seamons*, the Tenth Circuit held that even though the student plaintiff did not have a constitutional right to play on his high school football team, the school could not take away that benefit in retaliation for his constitutionally protected speech. *See Seamons*, 84 F.3d at 1237–39.

The court explained:

> The government may not "deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech"—even though the person has no right to the valuable governmental benefit and "even though the government may deny him the benefit for any number of reasons."

*Id.* at 1236 (quoting *Perry,* 408 U.S. at 597). Thus, it is irrelevant that the Pierces did not have a constitutional right to send their children to the school of their choice. There is no dispute that their children were in fact enrolled at AKCS, and the Pierces allege that their children were disenrolled because of the Pierces' exercise of their First Amendment rights. Thus, as the court held in *Seamons*, "[i]n light of the well established principle that the government may not deny a benefit to a person because of his constitutionally protected interests," *id.* at 1238, Ms. Henderson is not entitled to qualified immunity on count IV of the amended complaint.

## 2.   *Procedural Due Process Claim (Count V)*

Count V of the amended complaint alleges that the Individual School Defendants deprived the Pierces of their right to access their children's public school grounds, and their "right to be [free] from in[ter]ference for matters concerning the care and safety of their child[ren]"[3] without reasonable notice or a reasonable opportunity to be heard. Doc. 10 ¶¶ 121–27. The defendants argue that they are entitled to qualified immunity because it is not clearly established that the Pierces have a liberty or property interest in accessing school grounds or directing their children's education, and if they do, they received reasonable notice and an opportunity to be heard. *See* Doc. 44 at 15–18. The Pierces respond that they have a fundamental liberty interest in controlling the direction of their children's education, and that

---

[3] The amended complaint appears to be missing key words and letters. The bracketed portions are what the Court believes the amended complaint should say, based on the context.

because of this interest, ample procedural safeguards should be put in place before government officials may restrict this interest.  *See* Doc. 54 at 20–21.  They argue that their liberty interest is clearly established, and that whether they had reasonable notice and a reasonable opportunity to be heard is a factual question that cannot be determined on a motion to dismiss.  *See id.* at 21–22.  I agree with the defendants.  Because the Pierces have failed to plausibly allege a protected liberty or property interest of which the Individual School Defendants deprived them, they have failed to allege a valid procedural due process claim.

To establish a procedural due process claim, the Pierces must plausibly allege "(1) a constitutionally cognizable liberty or property interest, (2) a deprivation of this interest, and (3) a lack of constitutionally adequate notice and a hearing."  *Martin Marietta Materials, Inc. v. Kansas Dept. of Transp.*, 810 F.3d 1161, 1172 (10th Cir. 2016); *see also Seamons*, 84 F.3d at 1234.  The amended complaint alleges that the Pierces' had a liberty interest in "being at public places, traveling, moving, and associating with others," as well as a "right to be in public places, access to public accommodations, such as the right to be on a public school campus to drop off and pick up one's children."  Doc. 10 ¶¶ 121–22.  These allegations appear to assert a liberty interest in having access to the AKCS campus.  The amended complaint also alleges that the Pierces "have a right to be [free] from in[ter]ference for matters concerning the care and safety of their child[ren]."  Doc. 10 ¶ 123.  The Pierces characterize this interest as a "liberty interest in controlling the direction of their children's education."  Doc. 54 at 20.

Neither of these interests constitutes a constitutionally cognizable liberty interest, or at least not one that was so clearly established that a reasonable official would have understood no action could be taken without notice and a hearing.  The Pierces say that their right to control the direction of their children's education was recognized in *Troxel v. Granville*, 530 U.S. 57, 66

(2000).  Although it is true that the Supreme Court recognized in *Troxel* that "the interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by this Court," *id.* at 65, the Pierces do not point to any cases that recognize a liberty interest in parental access to their children's school grounds and to be involved in the day-to-day education of their children.  The Court in *Troxel* held that a Washington state statute that permitted grandparents to obtain visitation rights to their granddaughters over the objection of the girls' mother violated the mother's "due process right to make decisions concerning the care, custody, and control of her daughters."  *Id.* at 75.  The liberty interest in *Troxel* is very different from the one the Pierces are asserting in this case.

The defendants argue persuasively that a parent's liberty interest in directing his or her child's education is far more limited in scope than the Pierces suggest.  In *Swanson, by and through Swanson v. Guthrie Independent School Dist. No. 1-L*, 135 F.3d 694, 699 (10th Cir. 1998), the Court held that "parents have a constitutional right to direct [their child's] education, up to a point."  The court noted that this right includes a parental right to send a child to a private school, but held that it did not include the right to send a child to a public school on a part-time basis.  *See id.* at 699–700.  The court further noted that the right did not include the right to exempt children from certain reading programs, or from a school's community-service requirement, or from an assembly that included sexually explicit topics.  *See id.* at 699 (collecting cases).  The right also did not include the right to exempt home-schooled children from standardized testing, or the right to exempt teachers at religiously-oriented private schools from state certification requirements.  *See id.* (collecting cases).  In short, "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject."  *Id.*

25

None of the cases cited by the Pierces suggest that parents have a clearly established and constitutionally protected liberty interest in being able to walk their children to their classroom and communicate with their children's teachers in unrestricted ways.  The cases, in fact, suggest otherwise.  *See Lovern*, 190 F.3d at 655–56 (affirming dismissal of non-custodial parent's claim that prohibiting him from entering school property violated his due process rights as frivolous); *Souders v. Lucero*, 196 F.3d 1040, 1046 (9th Cir. 1999) (plaintiff failed to establish that he had a constitutionally-protected interest in having access to a university campus; thus, there was no need to decide whether procedures employed to exclude the plaintiff were adequate); *Porter v. Duval Cnty. Sch. Bd.*, 406 F. App'x 460, 462 (11th Cir. 2010) (unpublished) (affirming dismissal of due process claim because parents had failed to show that they had a right to access school grounds); *Ritchie v. Coldwater Comm. Schs.*, 2012 WL 2862037, at *16 (W.D. Mich. July 11, 2012) (unpublished) ("In the context of due process claims, to this Court's knowledge, every court that has considered the issue has concluded that citizens, including parents, do not have a liberty or property interest in accessing school property."); *Lankster v. Williams*, 2012 WL 950096, at *3 (S.D. Ala. Mar. 5, 2012) (unpublished) ("Courts have held that members of the general public have neither a liberty nor property interest in being present on a school campus, and absent such an interest, they are not entitled to the procedural due process protections of the Fourteenth Amendment."); *Mayberry v. Indep. Sch. Dist. No. 1 of Tulsa Cnty.*, 2008 WL 5070703, at *4 (N.D. Okla. Nov. 21, 2008) (unpublished) ("Many courts have held that parents have no constitutional right to be on school premises.").  There simply is no clearly established and constitutionally protected right for the Pierces to have access to AKCS grounds.

The Pierces' insist that their due process claim is not just about their ban from the campus; instead, "it is that they were unable to participate in their children's education at the

AKCS to any meaningful degree." Doc. 54 at 21. Again, the Pierces have not cited any authority to suggest that this liberty interest exists, and, if it does, that it is clearly established. Again, the closest case suggests the opposite. In *Crowley v. McKinney*, 400 F.3d 965 (7th Cir. 2005), the Seventh Circuit examined a noncustodial parent's right to participate in his children's education. The court was extremely skeptical of the notion that parents had a "constitutional right to school records, or to be playground monitors, or to attend school functions." *Id.* at 969. It warned that "[f]ederal judges are ill equipped by training or experience to draw the line in the right place, and litigation over where to draw it would be bound to interfere with the educational mission." *Id.* Although the Seventh Circuit was examining the rights of a noncustodial parent— which it viewed as less than the rights of a custodial parent—the court observed that "the only federal constitutional right vis-à-vis the education of one's children that the cases as yet recognize . . . is the right to choose the school and if it is a private school to have a choice among different types of school with different curricula, educational philosophies, and sponsorship (e.g., secular versus sectarian)." *Id.* at 971. The court emphasized that the right did not include "a right to participate in the school's management." *See id.* The court concluded that it "greatly doubt[ed] that a noncustodial divorced parent has a federal constitutional right to participate in his children's education at the level of detail" he claimed. *Id.* at 971. It also held that because the existence of the right that the plaintiff had asserted was not clearly established, the defendants were immune from suit. *Id.*

The result is the same in this case. The Pierces have not identified any Supreme Court or Tenth Circuit case that suggests that parents have a constitutionally protected liberty interest in participating in their children's education to the degree that the Pierces assert. Because any such

right is not clearly established, the Individual School Defendants are entitled to qualified immunity on count V.  Count V will be dismissed.

### C.  Breach of Contract Claim (Count VII)

In count VII of the amended complaint, the Pierces allege that AKCS and/or APS policies and procedures created an implied contract with the Pierces regarding how AKCS would accomplish any ban from the AKCS campus, and that AKCS breached that contract.  *See* Doc. 10 ¶¶ 133–36.  Although the Pierces don't identify what policies they are relying on in their complaint, they attach those policies to their response to AKCS's motion to dismiss.  *See* Doc. 55-1.[4]  AKCS seeks to dismiss count VII because there is no valid written contract between the parties, and therefore it is immune from suit under N.M. STAT. ANN. 1978, § 37-1-23(A).[5]  Doc. 53 at 3–4.  AKCS further argues that written policies cannot form the basis of a valid written contract outside the employment arena.  *See id.*  The Pierces argue in response that the written polices constitute a valid written contract that satisfy the requirements of § 37-1-22(A), and that an implied contract based on written policies is enforceable outside of the employment context.  Doc. 55 at 3–6.  Although New Mexico law may be unclear as to whether an implied contract based on written policies is enforceable against state entities outside the employment context, the policies at issue here cannot, as a matter of law, form the basis of contract.

---

[4] "Rule 12(b) provides that if matters outside the complaint are presented to and not excluded by the court, then the court should treat the motion as one for summary judgment under Rule 56 and not as a motion to dismiss."  *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991) (citing FED. R. CIV. P. 12(b)).  Notwithstanding this general rule, however, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Alvarado*, 493 F.3d at 1215 (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

[5] "Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract."  N.M. STAT. ANN. § 37-1-23(A).

To state a claim for breach of contract under New Mexico law, a plaintiff must allege the existence of a valid contract, the defendant's breach of the contract, causation, and damages. *Camino Real Mobile Home Park P'ship v. Wolfe*, 1995-NMSC-013, ¶ 18, 119 N.M. 436, 442 891 P.2d 1190, 1196, *overruled on other grounds by Sunnyland Farms, Inc. v. Central New Mexico Elec. Co-op., Inc*., 2013-NMSC-017, 301 P.3d 387; *Armijo v. Wal-Mart Stores, Inc.*, 2007-NMCA-120, ¶ 34, 142 N.M. 557, 568, 168 P.3d 129, 140.   A contract may be express or implied.  An "express contract" is a contract that contains an exchange of explicit terms, either orally or in writing, that show that the parties intended to be bound by those terms.  *See* BLACK'S LAW DICTIONARY 273 (8th ed. 2005); *Lucas v. United States*, 25 Cl. Ct. 298, 303 (1992) ("An express contract must be manifested by words, either oral or written, which contains agreement and/or mutual assent.").  "For a contract to be legally valid and enforceable, it must be factually supported by an offer, an acceptance, consideration, and mutual assent."  *DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶ 9, 134 N.M. 630, 634, 81 P.3d 573, 577.

An implied contract is not expressly stated but can be inferred "from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."  *Orion Tech. Res., LLC v. Los Alamos Nat. Sec., LLC*, 2012-NMCA-097, ¶ 9, 287 P.3d 967, 971.  An implied contract may be evidenced by the course of conduct between the parties, written representations, oral representations, or a combination of representations and conduct.  *Id*. ¶ 10, 287 P.3d at 971–72.  Whether an implied contract arises from the representations of the parties depends on whether the representations create a reasonable expectation of contractual rights.  *Id*. ¶ 10, 287 P.3d at 972.  The expectation is measured by how definite, specific, or explicit the representation or conduct relied upon has been.  *Id*.

In this case, the Pierces allege that AKCS breached a contract arising out of the implied contract allegedly created by the APS policy[6] governing the banning of individuals from school campuses. *See* Doc. 55 at 1–3. Although there appears to be no case that holds that these precise policies or policies like them create a contract between parents and schools, the New Mexico Court of Appeals has suggested that a student may be able to establish a claim for breach of contract arising out of the implied contract created by the terms in a student handbook. *Ruegsegger v. W. NM Univ. Bd. of Regents*, 2007-NMCA-030, ¶¶ 22–23, 141 N.M. 306, 312, 154 P.3d 681, 687. In *Ruegsegger*, the New Mexico Court of Appeals addressed whether a student handbook—which contained a sexual harassment policy that established the university's commitment to an environment free of sexual discrimination—created an implied contract. *Id.* ¶¶ 29–30, 141 N.M. at 312–13, 154 P.3d at 687–88. The court indicated that it may accept the terms of a student handbook as imposing implied contractual obligations if it were reasonable for the student to expect that the defendant was contractually obligated to perform under the terms set forth in the handbook. *Id.* ¶ 24, 141 N.M. at 312, 154 P.3d at 687. "The reasonableness of the student's expectation is measured by the definiteness, specificity, or explicit nature of the representation at issue." *Id.* The court held, however, that the handbook's provisions provided guidelines for the operation of the university—not a guarantee to specific rights. *Id.* ¶ 30, 141 N.M. at 313, 154 P.3d at 688. Therefore, as a matter of law, the handbook's provisions did not constitute the terms of an implied contract and did not contractually guarantee the rights that the plaintiff asserted. *Id.*

---

[6] AKCS asserts that "as a charter school, [it] is not subject to APS policies and procedures." Doc. 59 at 2. Nevertheless, it assumes for the purposes of this motion only "that APS policies and procedures applied to AKCS administration, parents, and students." *Id.*

An examination of the policy at issue here leads to the same result.  The policy on which

the Pierces rely is entitled "Banning Individuals from School Campuses" and states as follows:

> While schools make every reasonable effort to welcome parents and other community members to participate in school activities, an individual may be banned from a school campus if:
>
> 1. he/she presents a threat to the safety of students and/or employees of the District, or other individuals appropriately participating in a school activity, or
> 2. he/she creates a disruption to the educational process.
>
> Banning a parent from campus is a serious action that the District wishes to avoid if at all possible.  Principals are urged to attempt other interventions, such as a warning letter, before turning to banning a parent.  However, safety concerns for the school community must take priority.  Contact the Student Service Center for a copy of the Warning Template.

## Immediate Situations

> In situations in which there is an immediate threat to safety or immediate interference in the educational process, the principal proceeds as follows:
>
> 1. Ask the individual to leave the campus.
> 2. If the individual does not comply, the principal contacts APS School Police or another appropriate police agency to request assistance in removing the individual from the campus.
> 3. If the principal has reason to extend the ban beyond the single incident, he/she follows steps 1 through 4 in the section below. (Non-Immediate Situations.)

## Non-Immediate Situations

> 1. Prior to taking any such action, the principal should discuss the issue with the appropriate Associate Superintendent and request permission to issue a ban letter.
> 2. If a ban letter is approved, the principal then issues the District form letter used for notifying an individual that he/she has been banned from a school campus, with appropriate details included.  Contact the Student Service Center for a copy of the Ban Template.
> 3. The principal sends the letter by Certified Mail to the individual being banned, with a copy also sent to APS School Police, the APS Student Service Center and the appropriate Associate Superintendent.
> 4. Every ban situation must be reviewed at least annually, or earlier at the principal's discretion.  Bans will not carry over from one year to the next, unless with the permission of the appropriate Associate Superintendent.

Doc. 55-1.

Although the parties disagree as to whether written policies may form the basis of an implied contract that satisfies the requirements of N.M. STAT. ANN. 1978 § 37-1-23(A) outside of the employment context, I find it unnecessary to address that question. Assuming that § 37-1-23(A) does not bar the Pierces' claim, they still have failed to state a claim for breach of contract based on the language of the banning policy. *See Ruegsegger*, 2007-NMCA-030, ¶ 22, 141 N.M. at 311, 154 P.3d at 686 ("for purposes of this case we can assume without deciding that Section 37–1–23(A) does not bar Plaintiff's claim based upon the terms of the Student Handbook because we hold that Plaintiff has failed to state a valid claim for breach of contract based upon the language of the Student Handbook").

Without addressing whether the amended complaint alleges the basic elements of a contract, i.e., an offer, acceptance, consideration, and mutual assent, of which I am doubtful, the Pierces claim that the banning policy says that parents can *only* be banned for the two reasons listed in the policy, and that if a school bans a parent, the school is *required* to follow certain procedures. A plain reading of the policy, however, belies their claims. The policy states that an individual "may be banned" for either of the two listed reasons, but it does not say that these are the *only* reasons an individual may be banned. Doc. 55-1. The policy also "*urges*," but does not *require*, principals to attempt other interventions before banning a parent. *Id.* (emphasis added). The policy describes procedures for principals to follow if there is an immediate threat to safety or immediate interference in the educational process, or if the threats are non-immediate. *Id.* Notably, the procedures do not state that parents or other banned individuals have the right to contest a ban. *Id.* And although the policy states that a principal "*should* discuss the issue with the appropriate Associate Superintendent and request permission to issue a ban letter" before

32

issuing the ban letter, *id.* (emphasis added), the policy does not *require* a principal to do so.  *Id.*

The policy then delineates further procedures for a principal to follow, which mostly omit

mandatory language such as "must" or "shall."  *Id.*  Thus, these procedures, like those in

*Ruegsegger*, provide guidelines for principals to follow if they wish to ban a parent from a

school.  They are not a contractual guarantee that a school will follow these procedures every

time a parent is banned from a campus.  The Pierces could not reasonably expect, as a matter of

law, that AKCS was contractually obligated to follow the banning procedures outlined in APS's

banning policy.  Count VII will be dismissed.

### IV.   Conclusion

For the foregoing reasons, the Court GRANTS in part and DENIES in part the Individual

School Defendants' Motion to Dismiss Based on Qualified Immunity (Doc. 44).  Counts I, II,

III, and V are dismissed with prejudice.  The motion to dismiss count IV is DENIED.

The Court further GRANTS AKCS's Motion to Dismiss Breach of Contract Claim (Doc.

53).  Count VII is dismissed with prejudice.

_____
Laura Fashing
United States Magistrate Judge